UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | 2:18-CR-107-JRG |
| vs. | ) ) | |
| ALTON MAURINSE HOLSTON, | ) ) | |
| Defendant. | ) ) | |

## REPORT AND RECOMMENDATION

Defendant, Alton Maurinse Holston, filed a Motion to Suppress, addressing the duration of the traffic stop, his admission to possessing contraband and a firearm in his vehicle, and the ultimate discovery of additional contraband and firearms in his hotel room [Doc. 30, 36, 41]. The United States responded to the motion [Doc. 35, 38, 42]. This matter is before the Court pursuant to 28 U.S.C. 636(b) and the standing orders of the District Court for a Report and Recommendation.

On June 27, 2019, the Court conducted an evidentiary hearing on Holston's motion. Present at the hearing were Holston, his counsel, Tim S. Moore, Esq., and Assistant United States Attorney Thomas A. McCauley, Esq. Testifying at the hearing was Johnson City Police Department ("JCPD") Officer William Saulsbury. The matter is now ripe for resolution. For the reasons stated herein, the undersigned RECOMMENDS the Motion to Suppress [Doc. 30], as supplemented, [Doc. 36, 41] be GRANTED.

## I. PROCEDURAL BACKGROUND

On August 15, 2018, the Grand Jury returned a three count indictment charging Holston with possessing with the intent to distribute a quantity of crack cocaine in violation of 21 U.S.C. § 841(b)(1)(C), possessing a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1),

and possessing a firearm in furtherance of a drug trafficking offense as charged in count one in violation of 18 U.S.C. § 922(c)(1)(A).

In Holston's initial Motion to Suppress, he claimed law enforcement violated the Fourth Amendment in searching his hotel room in Johnson City, Tennessee, where officers seized crack cocaine and several firearms [Doc. 30, pg. 1]. He filed a second motion to suppress also challenging the search of his vehicle at the scene of the traffic stop that had occurred earlier[1] [Doc. 36]. Finally, when the Government noted that his second motion was insufficient to even respond to, Defendant filed a supplement claiming, among other things, that he was "seized and held for a period too long for the purposes of the stop." [Doc. 41, pg. 2]. He also argued his statement was obtained in violation of *Miranda*.

The United States responded that the search of the hotel room was by consent of Defendant's girlfriend who was present in the room at the time of the search. [Doc. 35, pg. 5]. The United States also argued that the search of the vehicle was supported by probable cause as Defendant had admitted to possessing crack cocaine and a firearm in his vehicle prior to the search. The United States also argued that the detention was not unreasonable and that *Miranda* does not apply to investigatory detentions.

## II.     FINDINGS OF FACT

At about 6:40 a.m. on July 12, 2018, dispatch reported that an employee from the Exxon gas station called to report a suspicious person near its place of business off Boones Creek Road in Johnson City, Tennessee. Patrol Officer William Saulsbury (Saulsbury) of the Johnson City Police Department responded along with other officers. Saulsbury drove up to the Shell station across from the Exxon and saw a vehicle matching the description provided in dispatch. The

---

[1] This motion was about as "bare bones" as a motion to suppress could be. It simply stated that "the initial search was without a valid consent or other grounds to search the car and to seize items out of the car." [Doc. 36, pg. 1].

vehicle was about to exit the parking lot of the Shell station and enter onto Boones Creek Road. At 6:41 a.m., Saulsbury activated his blue lights and pulled up next to the vehicle. The vehicle stopped. Saulsbury did not witness any traffic violations. The entire incident was recorded by the officer's dash cam and admitted into evidence. See Exhibit One.

Saulsbury approached the vehicle and asked the driver, later identified as Holston, to turn off the car and "step on out of the car for me." Saulsbury opened the driver's side door for Holston to exit. Holston complied and stepped out. Saulsbury then asked for his driver's license and that he would explain why he stopped him "in just a minute." Holston did not have it on his person so he re-opened the car door to retrieve it. Saulsbury said "I'll get it for you, where's it at?" Holston said he would get it. Saulsbury initially permitted him to look for it, but when he noticed a bag in the car, he said, "Come on back here, I'll look you up. Don't dig in the bag. I'll look you up." Holston closed the door and followed Saulsbury to the front of his cruiser. Saulsbury directed Holston to stand in front of his cruiser. Holston inquired about why he was stopped again, and Saulsbury said he would explain "in just a minute." (DVD 6:41:40). Saulsbury went back to his car and then returned and asked for Holston's social security number. He provided it. (DVD 6:41:55). The following colloquy then occurred:

| Time | Speaker | Statement |
|---|---|---|
| 6:42:00 | Saulsbury: | What are you doing up here this morning? |
| | Holston: | I just stopped at the store and got me some beer and go back to my room. |
| | Saulsbury: | What store did you stop at? |
| | Holston: | The Exxon. Then I stopped over there to check on the air pump but it was out of order |
| | Saulsbury: | Check on what? |
| | Holston: | Air pump. (pointing to his back tires) check on my low tires. (inaudible) Headed back to my room. I am staying right there at Woodsprings. |
| | Saulsbury: | How long have you been staying up there for? |
| | Holston: | About five weeks now. |
| | Saulsbury: | Five weeks? |
| | Holston: | Yeah. |
| | Saulsbury: | What was your social again? |
| | Holston: | (Provides his social security number) |

|          |            |                                                                                                     |
|----------|------------|-----------------------------------------------------------------------------------------------------|
|          | Saulsbury: | Tennessee? |
|          | Holston:   | No, I'm from Georgia. |
|          | Saulsbury: | What brings you up to Tennessee? |
|          | Holston:   | My girlfriend. |
|          | Saulsbury: | Who's your girlfriend? What's her name? |
|          | Holston:   | Katesha. |
|          | Saulsbury: | What's your last name? |
|          | Holston:   | Holston. H-O-L-S-T-O-N. |
|          | Saulsbury: | What's your first name? |
|          | Holston:   | Alton. A-L-T-O-N. |
|          | Saulsbury: | What's your date of birth, Mr. Holston? |
|          | Holston:   | (Provides date of birth). |
| 06:42:58 | Saulsbury: | Do you work anywhere? |
|          | Holston:   | I just do the Uber when I go to Knoxville and come back here at home. |
|          | Saulsbury: | Where's your girlfriend at? |
|          | Holston:   | Up in the room. |
|          | Saulsbury: | The reason I'm talking to you today is ladies over there at that Exxon have called in and complained on you. Said you're acting strangely and they feel like you're watching them. |
|          | Holston:   | What? |
|          | Saulsbury: | Have you done anything to give them an indication that you're doing that? |
|          | Holston:   | No, I go there regularly because they got the coldest beer over here. I mean, that's it. And (inaudible) and have application for a job (inaudible) I mean, nah. I don't know where that come from. |
|          | Saulsbury: | Been in trouble up here before? |
|          | Holston:   | Yeah, man. |
|          | Saulsbury: | For what? |
|          | Holston:   | Uhh, simple possession. |
| 6:44:00  | Saulsbury: | Crack or something like that? |
|          | Holston:   | (Inaudible) out here? I was just in my room. Stop me over here. … Been here five minutes. |
|          | Saulsbury: | They don't want you back in the store, that store the Exxon. So, you're not to be in the parking lot or anything, Ok? Cause the thing about it is, we're gonna keep getting calls on you if you hang around this area. Like if they see you in the parking lot of Dominos, they're gonna call in on you. If they see you over here, they're gonna … Right or wrong. |
|          | Holston:   | But I live right up the street. |
|          | Saulsbury: | I'm telling you how it goes. |
|          | Holston:   | I can't come to these places? |
|          | Saulsbury: | You can come to this place, you just can't go to the parking lot there. And I'd be careful how you act over here. You see what I'm saying? |

|  |  |  |
|---|---|---|
|  | Holston: | Yeah. |
|  | Saulsbury: | Because if they perceive that hey he's watching us again they're gonna call us, you know? |
|  | Holston: | I don't know where they're coming from. |
|  | Saulsbury: | Have you been going to your court dates for the charges you have up here? |
|  | Holston: | Yeah. |
|  | Saulsbury: | How have those gone? |
|  | Holston: | They should be getting resolved next week. |
|  | Saulsbury: | Are they? |
|  | Holston: | I was in a car with another guy who did that charge I was just at the wrong place wrong time. |
|  | Saulsbury: | Got you with a bunch of crack or something? |
| 6:45:00 | Holston: | Nah, they got him with a bunch of crack. |
|  | Saulsbury: | (talks to dispatch). What are you doing drinking and driving? |
|  | Holston: | (inaudible) |
| 6:45:15 | Saulsbury: | I need a 10-29 on a black male. His first name is Alton A-L-T-O-N. Last name is Holston (gives date of birth). (Turning to Holston). Do you have anything illegal in the car, anything that I should be concerned about? |
|  | Holston: | Nope. |
|  | Saulsbury: | (hears from dispatch) Holston as in East Holston Avenue. You don't have anything illegal in the vehicle? |
|  | Holston: | No |
|  | Saulsbury: | Care if I go through it to make sure? |
|  | Holston: | Nah, man, this is harassment. |
|  | Saulsbury: | It's not harassment I told why we were out here. |
|  | Holston: | I went to buy a beer and get some air all this…(inaudible) …. Is it because I'm… |
|  | Saulsbury: | (Turning to another officer) Canine too. |
| 6:46:00 | Holston: | Let me call my wife. |
|  | Saulsbury: | You're not calling anybody right now, just hang on. You're being detained right now until we get done with you. You committed a crime actually. You got an open container in your car. So. Let's try this, let's try this approach. I know you've got something illegal in your car. There's about to be a drug dog come out here to take a good sniff of that car while we're talking to you. So you need to think real hard about if you want to lie to us or be honest with us right now. Cause when the drug dog alerts, that car is gonna get searched. Ok? So, you might as well come off what you got in there. What do you got in there? |

| | |
|---|---|
| Holston: | How you think I got something? |
| Saulsbury: | Cause I've worked long enough and when I asked you about something and you immediately became more nervous. Look at what you're doing with your glasses right now. You're like this. (Officer Saulsbury makes a circular motion with his right hand to mimic Holston spinning his sunglasses.) |
| Holston: | Nah… |
| Saulsbury: | That's a nervous tic. You weren't doing that before I asked you any kind of … even when we mentioned the store you weren't doing that. So, I'll let you tell me what you have in the car because we can do it the easy way or the hard way. If we have to go digging for it, then you know you get what you get at that point. You tell us where it's at, you may have a chance for some mercy or some leniency. So. |
| Holston: | I might need a little leniency. |
| Saulsbury: | (dispatch calls). Go ahead (to dispatch). (Turing to Holston) Come back over here. (pointing to the front of cruiser). Come here. Stand right here by the car. Don't go walking and pacing and everything else alright? |
| Holston: | I thought you said stand right here. |
| Saulsbury: | I told you to stand right there. I am telling you not to go walking around or anything like that. (Talks to dispatch) 10-4. |
| (Holston stands just off camera next to cruiser). | |
| Saulsbury: | (Makes a running motion with arms to another officer)  Get me? (pointing to Holston) |
| Saulsbury: | (turning to another officer) En route?  Alright man, the drug dog's en route. So, like I said, I've done this long enough I know you've got something illegal in the car you don't want us to find. So, if the dog comes up here and sniffs your car and we can search it and we find it, then you're going to go to jail for it because you lied about it. Ok?  If it is something you can be given a ticket for, we will try to make that happen. Alright? |
| Holston: | (inaudible)….there might be something in there. |
| Saulsbury: | How much do you have in there? |
| Holston: | Couple grams. |
| Saulsbury: | Couple grams? Of what? Crack? |
| Holston: | Yeah. |
| Saulsbury: | Where at? |
| Holston: | (Points to car). |
| Saulsbury: | Just tell us where it's at.  We don't know what you've got in there. We can't just go dig through it.  Can we get it out? |

| | |
|---|---|
| Holston: | I would like to get it. I ain't going to do nothing. |
| Saulsbury: | Tell me where it's at so I know where you're gonna be digging. |
| Unidentified officer: | You got a gun or something in there man, you're probably ain't gonna get a ticket. |
| Saulsbury: | I tell you what, we'll just let the dog [unintelligible]. |
| Holston: | I'm gonna get it. It's in my bag. |
| Saulsbury: | Hang on. Sometimes people tell us oh I have a couple grams and then pull out a couple grams and it turns out they've got a big ole chunk somewhere else. So. I think you've got more than a couple grams. How much you actually have in there? |
| Holston: | That's it. |
| Saulsbury: | Ok. Then the dog will do its thing and then we'll search your car and we'll get it out ourselves. We don't know what you got in there, ok? |
| Holston: | I was just trying to tell you. |
| Saulsbury: | And I'm telling you we're good with that. The dog's still going to sniff. We're still going to search your whole car. So, it is what it is man. |

At 6:50:20, Officer Saulsbury asked Holston if he had ever been charged with a felony, and he admits that he is a convicted felon. At 6:50:30, Officer Saulsbury asked him if there were any guns in the car. He responded that he thinks so but he is not sure. At 6:54:22, Officer Saulsbury opens the car door and retrieves the bag and places the bag on the trunk of his patrol car. He then opens the bag and removes the items, including a firearm and suspected crack cocaine.

At 6:58 a.m., Saulsbury handcuffs Holston and places him in the rear of his patrol car. At 6:59:20, he gives Holston *Miranda* warnings, and Holston acknowledged that he understood his rights. Officer Saulsbury then told Holston, "I know you've got more stuff in your room." Officer Saulsbury then asked if he had anymore crack cocaine or weapons in his hotel room. Holston claimed he did not have a hotel room.

Officers then transported Holston to the Woodspring Suites and presented the hotel clerk with his room key. The front desk clerk provided the officers with the room number. They took Holston to the room where they knocked on the door. Kateshia Schneider answer the door. The officer advised her that Holston had been found in possession of crack cocaine and a firearm and

7

requested her consent to search the room. She consented. They asked Holston as well, and Officer Saulsbury testified that Holston consented too. Officer Saulsbury asked Holston if he had anything illegal in the room, and he responded that his safe contained crack cocaine. Officer Saulsbury used Holston's key to open the safe and discovered more crack cocaine and firearms.

## III.   ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures." U.S. Const. amend. IV. "[I]ts protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). This analytic framework involves two steps: (1) the government must articulate specific facts that create reasonable suspicion for the initial detention, *see United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002); Holston has essentially conceded this issue as he has not raised any issue pertaining to the initial stop; and (2) "whether the degree of intrusion ... was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and surrounding circumstances." *United States v. Torres-Ramos*, 536 F.3d 542, 552 (6th Cir. 2008). The second prong, the degree of intrusion, is what is at issue in this case.

In evaluating "the degree of intrusion," the Court considers whether the defendant was detained, and if so, was the detention "limited in [both] scope and duration." *Florida v. Royer*, 460 U.S. 491, 500 (1983). This means that (1) the stop "must ... last no longer than is necessary to effectuate the purpose of the stop," and (2) "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *United States v. Everett*, 601 F.3d 484, 489-89 (6th Cir. 2010) (citing *Royer*, 460 U.S. at 500). The burden for both is on the Government. *Royer*, 460 U.S. at 500.

Because Holston does not challenge the basis for the initial stop, the Court will assume it was lawful and will not address it except for purposes of considering the totality of the circumstances.[2] *United States v. Belakhdhar*, 924 F.3d 925, 927 (6th Cir. 2019)("[C]ourts must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing")(citations omitted).

A.     **Purpose and duration of the Stop**

The purpose of the stop was to investigate the officer's suspicion that Holston was "acting strangely" or watching Exxon employees in violation of the law. This was not a consensual encounter nor did the officer stop Holston for a civil traffic violation. Holston had not violated any traffic laws at the time the officer stopped him by his show of authority. So the officer's questioning of Holston had to be specific and directed towards why he stopped him. "A seizure … becomes unlawful if it is prolonged beyond the time reasonably required to complete the mission" of the stop. *Rodriguez v. United States*, 135 S. Ct. 1609, 1612, 191 L. Ed. 2d 492 (2015)(quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Because the officer did not stop him for a traffic violation, the time that he would normally have to prepare the citation was not in play. Because this was a non-consensual encounter directed to a specific concern about Holston "acting strangely," the officer's questioning of Holston was accordingly limited as such to accomplish that purpose. Any "[unrelated] inquiries [could] not measurably extend the duration of the stop" without converting the stop into an unlawful detention. *Rodriguez*, 135 S. Ct. at 1615 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). In this context, the risk of unrelated

---

[2]     "An investigatory stop of an individual by a law enforcement officer is proper so long as there is a reasonable basis for the stop." *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). "An officer can stop and briefly detain a person when the officer has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity." *Id*. (internal quotation marks and emphasis omitted).

questioning extending the stop is greater than in the context of a typical traffic stop that involves the officer writing a citation. *See Muehler v. Mena*, 544 U.S. 93, 101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (because unrelated inquiries did not "exten[d] the time [petitioner] was detained[,] ... no additional Fourth Amendment justification ... was required"). The context and mission of the stop is crucial to the analysis.

The officer's interaction with Holston cannot be described as directed towards the initial justification or "mission" for the stop. *Rodriguez*, 135 S. Ct. at 1612. He initially refused to advise Holston why he had been stopped. It would not have been obvious to him as he had not committed any traffic violations. Rather than laying out the purpose of the stop, the officer immediately began a roadside interrogation of Holston about what he was "doing up here this morning;" what store Holston had been to; how long he had been staying at the hotel; whether he was from Tennessee; when Holston advised he was from Georgia, the officer wanted to know what brought him to Tennessee; the officer wanted to know who his girlfriend was, what her name was, and where she was located; and whether he had a job.

Some of these questions could be read to relate to the purpose of the stop. For example, "what are you doing up here this morning?" would certainly relate to why the officer decided to stop him. That would be consistent with the stop's purpose. The officer's question about whether Holston had given "the ladies at the Exxon" reason to be concerned also would relate to the stop. But Holston answered those questions. Rather than advising him to stay away from the Exxon and ending the encounter, the officer needlessly prolonged the stop by asking more questions. He asked whether Holston had "been in trouble up here before." When Holston acknowledged that he had a simple possession charge, the officer wanted to know whether it was for "crack or something like that." At this point, if not before, the officer had broken away from the initial justification for the stop, that is whether Holston had been "acting strangely," and delved into

matters unrelated for which he had no basis to investigate. This prolonged the stop and "exceeded the time needed to handle the matter for which the stop was made [and] violate[d] the Constitution's shield against unreasonable seizures." *Rodriquez*, 135 S.Ct. at 1612.

Stops may be extended if, during the course of the stop, something occurs that generates the necessary reasonable suspicion to justify a further detention. *United States v. Blair,* 524 F. 3d 740, 752 (6th Cir. 2008). In this case, the officer asked Holston if he had been drinking and driving, but the officer did not investigate that issue at all because he was not concerned about whether Holston was intoxicated. He performed no field sobriety tests and did not believe Holston had any alcohol on his breath. The officer observed an open container in the car, but did not note that to Holston until Holston refused consent to search his car. He could, in fact, have written Holston a citation for a violation of the open container law. *See United States v. Wilkins,* 2012 WL 3871942, at *5 (N.D. Ohio Sept. 6, 2012)("they were justified in extending their stop to investigate the additional offense [of open container violation]"). But again, the officer took no steps to do so. As the Supreme Court noted in *Rodriquez*, "[t]he reasonableness of a seizure, however, depends on what the police in fact do." *Rodriquez*, 135 S.Ct. at 1616. This requires an officer to diligently pursue the purpose of the stop. "How could diligence be gauged other than by noting what the officer actually did and how he did it?" *Id.* In the officer's own words, rather than writing a citation for an open container violation, he decided to "try [another] approach."

> You committed a crime actually. You got an open container in your car. So, let's try this, let's try this approach. I know you got something illegal in your car. There's about to be a drug dog come out here and take a good sniff of that car …. So you need to think real hard about if you want to lie to us or be honest with us right now….. So, I'll let you tell me what you have in the car because we can do it the easy way or the hard way

(Exhibit One)(DVD 06:46).

Just as in *Rodriquez,* the purpose of the stop had been satisfied but the officer continued to detain the defendant. The officer had investigated the complaints by the Exxon employees and

warned Holston not to return to that business. Rather than ending the stop, the officer ventured into a separate and independent investigation for which he had no basis. To be sure, he could have pursued the open container violation, but he did not diligently pursue it. *See United States v. Sharpe,* 470 U.S. 675, 686 (1985)(in determining the reasonable duration of a stop, "it [is] appropriate to examine whether the police diligently pursued [the] investigation"). If, during the course of the investigation, the "bulk of the interaction between the officer and the motorist … [suggests the officer] definitively abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation," then that separate investigation must be supported by reasonable suspicion. *United States v. Everett*, 601 F.3d 484, 495 (6th Cir. 2010).

The "approach" employed by the officer was to extend the stop beyond the time needed to complete the initial investigation. *Rodriguez*, 135 S.Ct. at 1612 (the seizure becomes "unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission"). The officer had abandoned the open container violation and pursued a separate investigation for which he had no justification, no reasonable suspicion. Holston asked to call his wife, to which the officer said, "You're being detained right now until we get done with you." The stop went beyond the time that the Constitution would permit under these circumstances. Holston's ultimate admission that he possessed crack cocaine in the vehicle was obtained after the stop should have ended.

It could be argued that all of this questioning occurred when the officer was performing a records check. But the officer did not diligently pursue that.[3] Instead, he engaged him in a series of questions even before asking for a records check. "Police are not allowed to use the time that would have been needed for incidental inquiries as "bonus time" to venture out and conduct

---

[3] It is not clear that even such questioning could have been pursued, although in the typical traffic stop, such questions are routine. See *United States v. Lujan*, 2018 WL 3742452, at *6 (E.D. Tenn. Aug. 8, 2018)(Mattice, J)("Some of these incidental inquires may not be permissible if it becomes apparent no traffic violation occurred, such as was the case here").

unrelated investigations." *United States v. Lujan*, 2018 WL 3742452, at *6 (E.D. Tenn. Aug. 8, 2018)(Mattice, J). The officer's questioning of Holston about how his court dates have gone, and whether he had been caught with "crack or something like that" were all designed for "ferreting out unrelated criminal conduct" and simply prolonged the stop. *Everett*, 601 F.3d at 495. Rather, he pursued another line of questioning, unlawfully extending the stop when he finally got Holston to break. In *United States v. Stepp*, 680 F.3d 651, 662 (6th Cir. 2012), the Sixth Circuit recognized that there was a danger that an officer could delay pursuing the initial traffic violation until "she has satisfied herself that all of her hunches were unfounded." *Id.* Indeed, in that case, it found that just six minutes of extraneous questioning constituted an unreasonable seizure. *Compare Lujan*, 2018 WL 3742452, at *6 (holding just 20 seconds of prolonged questioning rendered the stop unlawful). Thus, "any … prolonging, even *de minimis*, is an unreasonable extension of an otherwise lawful stop." *Stepp*, 680 F.3d at 661-62. In *Stepp*, following the officer questioning the defendants, he called for a canine unit, which took three and a half minutes to arrive. The Sixth Circuit found this unreasonably prolonged the stop. That is what occurred here.

In this case, the officer also claimed he had reasonable suspicion of criminal activity based on Holston's nervousness. But the officer could only make that judgment about Holston's nervousness at a point in time when he was questioning him about crack cocaine, which was at a point when the officer had unnecessarily prolonged the stop.[4] An officer cannot unlawfully prolong a seizure to obtain reasonable suspicion of criminal activity to justify a search of the car. *See, e.g., Rodriquez*, 135 S.Ct. at 1616; *see also United States v. Davis*, 430 F.3d 345, 357 (6th Cir. 2005)("Officers must act to confirm or dispel their suspicions quickly. While they may be

---

[4] "While nervous behavior, standing alone, is not enough to justify a *Terry* search, … nervousness is still relevant to the reasonable-suspicion calculus." *United States v. Pacheco*, 841 F.3d 384, 393 (6th Cir. 2016)(citations and quotations omitted).

13

disappointed when their chosen investigatory technique dispels their suspicions, the Fourth Amendment does not permit them to keep trying until they obtain the desired results").

**B.      Is the evidence discovered sufficiently attenuated from the illegal seizure?**

"[T]o deter law enforcement officials from violating the Fourth Amendment by stopping persons without reasonable suspicion or by arresting them without probable cause, the Supreme Court has directed that 'all evidence obtained by an unconstitutional search and seizure [is] inadmissible in federal court regardless of its source.'" *United States v. Pearce*, 531 F.3d 374, 381 (6th Cir. 2008) (quoting *Mapp v. Ohio*, 367 U.S. 643, 654 (1961) ); *see also Weeks v. United States*, 232 U.S. 383 (1914) (establishing the exclusionary rule). "This exclusionary rule is supplemented by the 'fruit of the poisonous tree' doctrine, which bars the admissibility of evidence which police derivatively obtain from an unconstitutional search or seizure." *Pearce*, 531 F.3d at 381 (citing *Wong Sun v. United States,* 371 U.S. 471, 484-485 (1963). The Supreme Court has explained, however, that not all evidence must be suppressed "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun,* 371 U.S. at 487-488. Rather, this doctrine will not apply when the connection between the unlawful detention and the evidence subsequently seized has "become so attenuated as to dissipate the taint." *Id*. at 491 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

Thus, the next issue is whether the search of the car and the hotel room were nevertheless attenuated from the illegal seizure to permit their introduction into evidence. To determine whether a subsequent search is attenuated from the initial illegal seizure, the court must examine whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id*. at 488. The Supreme Court has set forth three factors to guide this inquiry: (i) the "temporal proximity" of the unlawful detention and the emergence of the incriminating evidence at issue, (ii) the existence of "intervening

circumstances," and (iii) the "purpose and flagrancy of the official misconduct." *Brown v. Illinois*, 422 U.S. 590, 603-604 (1975); *accord United States v. Shaw*, 464 F.3d 615, 625 (6th Cir. 2006) ("Dissipation of the taint resulting from an [illegality] ordinarily involves showing that there was some significant intervening time, space or event."). The Government bears the burden of persuasion to establish attenuation. *Kaupp v. Texas*, 538 U.S. 626, 633 (2003).

The Government did not address whether any circumstances purged the taint of the unconstitutional seizure. But it is clear from the evidence, they could not have. The officer continued to question Holston about the officer's belief that Holston had something illegal in his car *after* he had admonished Holston to stay away from the Exxon. He continued to ask for consent to search his car, which Holston refused, prolonging the stop. He could have written Holston a citation for an open container violation, but he chose to abandon that investigation. When he finally got Holston to break, he searched the car and discovered the cocaine. He arrested Holston for possessing crack cocaine and a firearm and took Holston directly to his hotel room. He confronted his girlfriend with the fact that her boyfriend, who was in handcuffs, had been arrested for possessing crack cocaine. This was almost *immediately* after his being arrested. The temporal proximity between the illegal seizure and the search of the hotel room was within minutes. *See, e.g., United States v. Lopez-Arias*, 344 F.3d 623, 630 (6th Cir. 2003) (thirty-minute lapse of time insufficient for attenuation); *United States v. Richardson*, 949 F.2d 851, 859 (6th Cir. 1991) (twenty-minute lapse of time insufficient for attenuation). There were no "intervening circumstances" or events that would "sever the causal connection between the illegal [seizure] and the discovery of the evidence," such as flight or the use of force. *United States v. Beauchamp*, 659 F.3d 560, 574 (6th Cir. 2011). The Government presented no evidence *independent of the seizure* that would have led them to either suspect cocaine to be in Holston's car or his hotel room. Finally, the officers' conduct was for the purpose of investigating Holston, particularly given the prolonged

and nonconsensual nature of the seizure that was not supported by reasonable suspicion. *United States v. Williams,* 615 F.3d 657, 670 ("[T]he purposefulness factor is met when the unlawful action is investigatory, that is, when officers unlawfully seize a defendant 'in the hope that something might turn up.'" (quoting *Brown*, 422 U.S. at 605). None of the exceptions apply to avoid the application of the "fruit of the poisonous tree" doctrine, which requires the exclusion of the evidence. Accordingly, the Court finds that his admission and the evidence obtained from the search of the vehicle and the hotel room should be suppressed as "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963).

## IV. CONCLUSION

The undersigned **RECOMMENDS** that Defendant Holston's Motion to Suppress [Doc. 23] as supplemented [Docs. 36, 41] be **GRANTED** for the reasons outlined herein**.**[5]

Respectfully Submitted,

s/Clifton L. Corker
United States Magistrate Judge

---

[5]Any objections to this report and recommendation must be served and filed within **fourteen (14) days** after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); *see United States v. Branch*, 537 F.3d 582 (6th. Cir. 2008); *see also Thomas v. Arn*, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the time period waives the right to appeal the District Court's order). The District Court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive, or general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).